Could the clerk call the next case please? 314-310, a re-estate of Jekyll and Sue Adams, deceased Michelle Ford Epley by Trent Bush vs. Diana Givens Appellant by Ronald Coughlin. Mr. Coughlin, good morning. I think it's Mr. Copeland, and I would like to call on both attorneys from my neck of the woods. It's not often that I have two attorneys from one side. May it please the court, counsel, and thank you, Justice Wright. I have, in my long history in the practice, been called a lot of names, and on occasion I didn't get it right. So, yes, it is Coughlin. I represent Diana Givens in her capacity as the appellant in this will contest case arising out of the death of Jekyll and Sue Adams, who will be referred to in argument as Jackie. Knowing that the court has assimilated all of the statement of facts, I would like to focus my initial comments on what I think is the core time and the core events that led us to this day. It's a short period of time, approximately two to three weeks, that begins in October of 2008 on the 30th day of October. On that date, the deceased Jackie and her then caregiver Nancy Koulos, and Jackie's long-time companion Howard Eugene Givens, traveled to Dixon to attend an appointment with Jackie's oncologist, Dr. Shipp. Dr. Shipp is connected with Swedish American Hospital in Rockford and has office hours in Dixon, and had been Jackie's treating physician for cancer for, well, beginning earlier in June of that year. So, they all traveled to Dr. Shipp's office, the three of them, and met with Dr. Shipp. The record will show for a period of approximately 50 minutes. The records show that all three of the travelers, Jackie, Nancy, and Gene, were present together with Dr. Shipp during that period of time. Gene is the companion, Nancy is the caregiver, Jackie is the patient, Dr. Shipp is the physician. During that period of time, there was a lot of conversation about Jackie's mental capacity and her condition, and it concluded with conversation about life-ending events, life-ending things, end-of-life requirements and things to take care of, taking care of business. During that time, there was a notation that Jackie was alert and oriented and that she concurred in the conversation, that she agreed with the conversation and the recommendation that end-of-life things needed to be attended to, including seeing an attorney to get a power of attorney drafted. She also apparently was fairly emphatic about not having heroic measures taken if she were to, you know, cardiac arrest or something. In other words, no coding is referred to sometimes to sustain her life if she were to experience an event. I think the conclusion of that is that all who were present believed that on that date and at that time, Jackie Adams was competent to execute a legal document known as a power of attorney. On that date, did she have a power of attorney? Was there an existing one? No, I don't believe so. Not one that has come into play. They traveled then from Dixon to Rock Falls to the offices of Louis F. Pignatelli, with whom Justice Wright is also acquainted, for purposes of making an appointment. Nancy apparently made the appointment for Jackie and for Gene to see Mr. Pignatelli or an attorney in that office on the 7th of November, a little over a week later, and they left Mr. Pignatelli's office having made that appointment. The next date that is significant is the 3rd day of November, just a few days later, when Jackie Adams and Gene Gibbons together arrived at the offices of Ellen Neal, an attorney in Sterling, apparently arriving without an appointment. They had an appointment with Mr. Neal that only lasted for a period of time. We don't know how much time because Mr. Neal doesn't remember. But during that meeting, Mr. Neal made some notes and there's a copy of those notes in the record that show a client interview sheet that referred and related exclusively to Howard Eugene Gibbons and about drafting a will and who his beneficiaries would be. There was a second piece of paper, a blank piece of paper that had some handwritten notes at the top, upper left hand corner if I recall, that related to Jackie Adams and the will for her, and notations as to beneficiaries indicating that Gene Gibbons, her longtime companion, and Gene's daughter Diana, all I refer to as Anna, Diana, and granddaughter Ashley, as apparently contingent beneficiaries is what it looked like. Those are the two sheets and those are the products of that meeting with Mr. Neal on that day. What had happened to the appointment with the first attorney? I'll get to that, but it was cancelled. That first appointment was cancelled later that day. An appointment was made then before they left Mr. Neal's office to revisit him on the 14th of November, which was a Friday. After they left Mr. Neal's office, Jackie and Gene returned to their home that they occupied and apparently called Gene's daughter Diana and asked Diana to come to the house because they wanted to talk to her about some things and indicated that they wanted Diana to serve as the attorney in fact for apparently both Gene and Jackie. Also during that conversation that evening, they directed, and according to the record, Jackie and Gene concurred in this, directed Diana to call Mr. Pignatelli's office and cancel that appointment that had been scheduled for November the 7th. Who testified to that? Because at the time of the hearing, Jackie and Gene were both deceased by the time this came forward. Yeah, that's correct. So the court received the testimony of Diana. That's correct. Okay. Diana kept an extensive log once she started providing caregiving services, which is also a part of the record, and extracts from that have been included in the briefs and arguments. The following day, Nancy, Jackie, and Gene together went to or met, they wound up at the Community General Hospital, CGH Medical Center in Sterling, which has a cafeteria which allows the public to come in and take meals there. And so they traveled there to have lunch, and I don't know whether it was, I think it was after lunch as they maybe were leaving, Gene informed Nancy Coulis that the appointment with Mr. Pignatelli had been canceled. Apparently, Nancy then called her daughter Michelle, who was the contestant in this case. Michelle resides or resided, maybe still does reside, in the state of Maryland, and so she flew in and came to Sterling on the fifth day of November of 2008. On the morning hours of November the 6th, Nancy and Michelle arrived at the home where Jackie and Gene were, ostensibly to take Jackie out for a girl's day out, as I understand it, arriving 9, 930 in the morning, as we understand it. Both Michelle and Nancy describe Jackie's condition in their testimony as being disheveled, unkempt, was not properly dressed, or wasn't dressed as they would normally expect her to be dressed. Apparently, Michelle had been on the East Coast for a number of years and I think returned a time or two each year to visit her mother and maybe Jackie in the Sterling Rock Falls area, but it may have been a while before she had been there. They took Jackie with them, telling Gene that they would be back by 1 o'clock or they would give Gene a call and tell him where they were. This day was spent going to an antique mall, going to hairdressers where Jackie didn't have her hair done but sat, lunchtime going to Morrison, some 12, 15 miles distant to Jackie's favorite place to eat, the Dairy Queen in Morrison, since I'm familiar with it I don't understand that, but that's all right, that's what Jackie liked. They also took Jackie to the law offices of Kelly Walker, a law firm of Miller Lancaster and Walker in Sterling. There was an initial appointment and apparently an interview conducted. Kelly Walker interviewed Jackie and Sackley, which time spent some time privately with Jackie to inquire about this power of attorney. They left and returned later in the afternoon, at which time there was another conference and I think at this time both Nancy and Michelle were present and at that time Jackie executed a power of attorney which had been drafted by Attorney General Sackley. This is another attorney with whom Justice Wright is acquainted. There were two visits to see Kelly Walker and a power of attorney drafted. The concern is that... Was it signed? I'm sorry? Was it signed? Yes. And the date of that was? The date of that was November the 6th. All right, and then when did Diana become POA, power of attorney? The power of attorney for Diana was signed on the 16th of November. But according to the facts that you're reciting, the meeting with Attorney Neal preceded November 6th? By three days. It was on the 3rd of November when they met with Mr. Neal. All right, did Jackie tell Attorney Walker that she had spoken to Mr. Neal? How about time? That testimony was never listed. Okay, does the record indicate that Jackie, that Attorney Walker knew that there had been a meeting with Attorney Neal? Mr. Walker didn't remember the meeting with Jackie. And then did Attorney Neal, does our record show that Attorney Neal knew that there was an existing POA for naming Nancy? Not on the 3rd, but he did know about it on the 16th. All right. Yes. I'm pretty sure of that. Okay. I believe that testimony and I know that testimony shows. And was he the one who executed, who prepared and had executed the power of attorney on the 16th? That was Owen Neal prepared the power of attorney. He also prepared wills for Jackie and for Gene. And at the time he prepared the power of attorney, he knew there was one in effect. I'm going to say yes, he knew it at the time, whether it was before he actually had him executed by Jackie in his office or after, but concurrently they were in his office. On the 16th, Jackie and Gene were driven to Owen Neal's office by Diana. And according to the record at Jackie's request and direction. The three of them were in the office with Mr. Neal for a period of 20 or 30 minutes, at which time Diana left the office, went outside to have a smoke and make a couple telephone calls, calling her mother and her daughter and was outside for another 20 or 30 minutes and went back in. They were in Mr. Neal's office on the 16th, an hour to an hour and a half is what it seems at that time. Thank you. I think what I want to emphasize and there are other aspects of this too is that there is contradiction, there is inconsistency to be polite about. The claim is on the part of the contestant and her mother that Jackie was not competent to execute the power of attorney on the 6th. They described her as staring off into space, not being communicative, having to be helped to walk up and down stairs and get in and out of cars, and that when she sat in Ms. Kelly Walker's presence, she didn't respond to Ms. Walker at all. The indication is that this goes to the testamentary capacity issue more than anything. She wasn't competent to execute the power of attorney yet. They took her there for that purpose. The same thing applies, I think, to the visit of Sid Franks from LSSI, who came on two occasions, one on the 7th of November and one again on the 18th of November, decided that Jackie was severely impaired, but on the 18th she asked Jackie to execute a release so she could get financial records of Jackie. We're filled with contradictions, we're filled with inconsistencies. What is our standard review here? I guess the manifestation of the evidence, and it gets into the credibility of my issue here. Credibility is which story are you going to believe when they are diametrically opposed. That's the trouble that I have here, an immense amount of trouble with that. How you can take somebody to an attorney asking them to draft a power of attorney for this person and then decide later on that person wasn't competent to execute it. That's just something that's beyond my comprehension. Can you touch upon the issue of undue influence, because didn't the trial court also decide lack of testamentary capacity and, in addition, undue influence? The trial court, in a sense, piggybacked the undue influence a little bit on the lack of testamentary capacity, not exclusively by any means, but he did recite and said he was concerned lack of testamentary capacity then lowered her resistance to undue influence kind of thing. Would you address that issue, please? The undue influence issue, as I see it, is this couple, Gene Gibbons and Jackie Adams, have been together since 1991. They had lived together since the year 2000 or 2001 in the same home together. They traveled together, they were together constantly, they were together all the time. Yet they weren't married. They were not married. No, they never married. So that's a close relationship. If they had been married, we wouldn't be here today, obviously, in my book. Sometimes there's reasons people don't get married involving property. I'm sorry, but... I search the record and try to find evidence of undue influence. The attempt has been made to establish a fiduciary relationship based on the power of attorney. Well, the power of attorney that was named Diana was the 16th. On the third, Jackie already indicated to Elwynn Neal, I want Gene to be the primary beneficiary, I want Diana to be the secondary beneficiary. That was on the third. That will was signed on the 16th. But it's the same information given to them on the third. On the 30th, did Jackie indicate to Dr. Shipp that she wanted Nancy to be the power of attorney? I'm not certain if that was expressed. I think that was a given. I think that was an understanding because Nancy had been the caregiver and a friend and had been a longtime friend. I think that was probably understood. I don't know if it was expressed as such. I don't think that shows in the medical records, but I'm assuming because Nancy immediately then took them to Mr. Picantelli's office directly from the doctor's office. I assume that that was probably the case. You have pointed out that you think there's some suspicious motivation on Nancy's behalf by taking Jackie to Attorney Walker when they knew she wasn't competent. And I think Nancy even testified that Jackie wasn't herself that day. Well, that's her testimony. Again, that's the contradiction. But on that day, Attorney Walker wasn't asked to prepare a will. No. So what do you think the record shows changed between the day Jackie was in Attorney Walker's office discussing a POA and the day three days earlier that she was in Attorney Neal's office discussing changing her will? Why were the conversations shorter in Attorney Walker's office versus based on the record? I can speculate, but I can't point to anything. This is a long-term relationship with this couple. Gene Givens was a primary beneficiary under the earlier will of 2000. He was to receive half the estate. We now have a situation where Jackie is suffering from terminal cancer and the consensus with her physician, with her companion, with her friend's caregiver is that she needs to take care of end-of-life issues. The will that the court enforced, did Gene or his estate take anything under that will? Well, he predeceased Jackie. All right. So if he had lived, he would have taken half. Yes. All right. Yes. Too bad that will wasn't for service. Isn't that interesting? I didn't know you guys were a visionary then. Okay. But that's not what happened. I think we may be over the time limit, but you have addressed my question on the end-of-life. Okay. Anything? Thank you. You'll have time for rebuttal, Mr. Oakland. Mr. Bush, good morning. Thank you. Good morning. May it please the court, counsel. Good to see you, Your Honor. My name is Trent Bush on behalf of the contestant in this case, Michelle Ford. I think Justice Litton's question to Mr. Copeland hit the nail on the head. What is the standard of review in this case? We are here before this court a year removed from a two-day trial in which the trial judge heard from nine witnesses, one evidence deposition, many stipulations, as you'll see in the trial binder, a whole stack of medical records. These are the same arguments that were made to the trial court. The trial court, after hearing from the nine witnesses, considering the evidence deposition, considering the stipulations, considering the medical records, made a quite extensive ruling, and you'll see from that ruling on the bench, considered every element of the three bases that we argued to set aside this will, every argument. There is no claim that the trial court made a legal error here. There can't be the claim because the trial court followed the letter of the law, and in its ruling you will see went down every single element, lack of capacity, undue influence, and the third basis that we argued, of course independent of those, was that the will was not properly witnessed. But there is no cross-appeal in that. Your Honor, Mr. Copeland did file a motion to dismiss that section of my brief. I filed a response and objection to that, and the court ruled against his motion to strike that section. The case, the Supreme Court rules in the cases are clear. When the judgment was not adverse to the appellee, there is no need to file a cross-appeal if you just simply disagree with the reasons of the trial court. Here, the trial court ruled exactly like we wanted the trial court to rule. It set aside the November 16, 2008 will and put back in place the March 15, 2000 will, under which Gene Givens was to take half, Michelle Ford was to take the other half, whoever pre-deceased took the other's share. So we have to remember what context that we're here. The trial court considered all of this information. It heard the evidence. Of course, with a manifest review standard, this court will not substitute its judgment if there is any evidence to sustain the trial court's ruling. As is clearly evident from reading simply through the trial court's ruling from the bench, not only is there any evidence to support its findings, there is overwhelming evidence to support its findings. In fact, the evidence, the court got just to the edge, and this is the third issue that I argued in my brief, which was the improper attestation issue. The trial court got just to the edge and found all the necessary facts to find that the will was not properly witnessed in the first place, but did not rule in our favor on that issue. Now, the trial court, of course, did find in our favor on the remaining two issues, but as I've argued in the brief, the facts are clear that this will was not properly witnessed, along with the fact that she did not have the capacity to sign this will and that she was unduly influenced. Now, if I could just tick through a couple of the items that Mr. Copeland rose. Can you touch on why you think the will wasn't properly attested? Now I cut your argument off of my question. I am happy to address the court's questions, Your Honor. November 16 was a Sunday. Because there wasn't a second witness. There wasn't a second witness. November 16 was a Sunday. Diana drove Jackie, who could not drive, who could not make a phone call, who needed 24-hour supervision, she drove Gene and Jackie to Mr. Neal's office on a Sunday. There is no dispute from anyone. There is nothing to suggest that Cindy Hogewerth, the second witness to that will, ever worked a Sunday. There is no dispute. She was not present on November 16th, Sunday. But she testified that she doesn't come in on Sundays. Absolutely. And there's no dispute. Diana acknowledged that she was. So there was no explanation in the record why she signed off on a will dated November 16th, how that happened. The explanation is, well, we don't remember when the will was executed, but it must have been the 17th. And as I've outlined in the brief, there is no way, and as the court even found, he did not find it credible that this will could have been witnessed on November 17th. He did not believe that story. And he didn't make any findings with respect to the conflicting dates. This is the words of the trial judge. I have my suspicions, but suspicions are not evidence. Okay. So that is where the improper attestation issue was left with the trial court. Now, first of all, back to the October 30 appointment. This is what is recited throughout this trial, throughout the briefs, as the end-of-life discussion with Dr. Shipp, who was Jackie's oncologist for many months by that time, from the summer of 2008. And as the medical records track, the confusion was consistent. October 30 rolls around. The entry from the medical records, everyone agrees Jackie is more confused, requires continuous care. The decline was noted. The decline triggered the end-of-life discussion with Dr. Shipp, which in turn set all these things into motion. The record from October 30, the court asked whether or not Nancy was POA. She was POA, and the record from the 30th reflects that Nancy is medical POA. We discussed the need to find additional caregivers for the home. Jackie needs a general POA. The POA clearly states she wishes Nancy to be her POA for general care and finances as well. Recommended that she go to Nancy, that she and Nancy go to a lawyer as soon as possible. So Nancy had been the one providing all of the care to that point, all of the care. Diana had zero involvement in the care, never took her to a doctor appointment, never took her to a lab appointment. Nancy is the one who spent six weeks with her up in Mayo. Diana had not been involved at all. But here we have an end-of-life discussion on October 30, and on November 3, Gene takes Jackie, who can't drive and who can't use a phone call, to his lawyer, who had previously prepared a will for Gene, who had previously filed bankruptcy for Diana in 2002, to discuss what? So the focus wasn't on providing for Jackie's end-of-life issues. The focus was on, hey, let's get a new will. Again, the trial court heard all of these arguments, and it obviously did not find that this story, that she would make a last-minute change to cut out Michelle and put in her place Gene and his daughter, did not make sense. Mr. Bush, what is the value of this estate? Your Honor, it's approximately $700,000. Again, Mr. Copeland made some argument with respect to, well, Dr. Shipp and Gene and Nancy and Jackie, they must have assumed that she was competent on October 30. Of course, legal competency to execute a will is a legal decision. That's for the court to decide. The court can consider evidence at the time and around the time of the events. So that's the court's job. We can't foist off on an individual who's following her oncologist, Nancy, the caregiver, who's following the oncologist's direction to get her affairs in order, that she somehow has either the right or the ability to decide that she was competent on that day and around that time to execute a legal document. That's the court's job. The court considered the evidence it found against that theory. Again, to put into context, Diana had not been involved until November 3, when all of a sudden Gene takes Jackie to his attorney, talks about a new will, and, hey, Diana, why don't you be our caregiver now? And then she starts writing her journal, which curiously or not curiously supports her version of facts that Jackie is perfectly competent throughout this time period, despite the fact that Gene clearly agreed that she was more confused, required continuous care as of October 30. The medical records for months had said that. Mr. Copeland also mentioned that the record and the testimony was replete with contradiction and inconsistency. That is the point of a trial. The court heard the evidence. The court heard the inconsistencies. After considering all of the facts, it determined what it believed to be the more credible story. Also, the characterization that the court quote-unquote piggybacked its decision on undue influence with lack of capacity, as the court knows, those issues are often related in these cases. They're legally related to the extent that the less capable one is, the more susceptible they are to undue influence. That's the Rossler decision. That's exactly the issue that was there. And the court stated that the more one lacks capacity, the less is required to show undue influence. And that's how the court piggybacked those two issues. It appropriately considered the fact that by that time, Jackie simply was unable to handle her affairs. And accordingly, under the law, is more susceptible to undue influence. And on the undue influence issue, once again, if you read the court's ruling from the bench, it ticks through every single factor that's required for the court to find a presumption of undue influence. And it found the four elements that are required existed in this case. One of the issues that Mr. Copeland has argued and is in his brief is that there's just no evidence of a fiduciary relationship or dominance by Gene or Diana. I disagree with that reading of the facts. The trial court disagreed with the reading of that fact. And it also ignores the fact that if one is entitled or should be expected to be a recipient of one's estate and is cut out following the act of participation of a beneficiary of the new will, the presumption arises regardless of the existence of a fiduciary relationship. That's exactly the case here. So the arguments with respect to fiduciary relationship and dominance don't carry the day. The court properly found, due to the nature of the relationship between Gene, Diana, and Jackie, that they were in a position to be fiduciaries, not by operation of law, not by a power of attorney, which was apparently executed simultaneously, but by nature of the relationship. Even kindness and affection can create a fiduciary relationship. The court did not say that these parties did not have a relationship. They clearly did. We never said that they didn't have a relationship. But that does not mean that Jackie Adams was competent to sign a will on November 16 or November 17 of 2008. It does not mean that she was not unduly influenced. Under that logic, if Nancy had taken under the new will, she had the same fiduciary relationship based on the loving relationship that Judge Stein has noted, I think, before he even announced his ruling. Obviously, everybody loved Jackie, and vice versa. That's correct. And the great thing about the court's decision was it reflected on Jackie's life, and one's will should be a reflection of one's life as they lived it and who was important to them. The fact that Diana was going to take under this will and have this close relationship, that's what puts her under a magnifying glass. Well, by November 3, as the log or register or diary or whatever you want to call it reflects, she stepped in and did all those things. She was there. And that was the interaction at that point in time. Did the court find the undue influence was on Gene's part, Diana's part, a combined influence exerted by both of them? The court touched on the facts with respect to both Gene and Diana's actions throughout this time period. But in the final paragraph or two of its ruling essentially said, I find this will to be more that of Gene's than the product of Jackie's wishes. Okay. Counselor, you have two minutes. Thank you. Can I ask you one more question? Yes, Your Honor. Do you think we should draw any conclusions from the fact that it's undisputed Jackie didn't ask either Attorney Walker or Attorney Neal to make Gene the person who was making her medical decisions, the POA? Well, that gets to what I call the boogeyman argument, Judge. Was that presented to the court? Well, the court was aware that in these October 30 medical records, she clearly stated she wanted Nancy to be the POA. The court noted this kind of back and forth between the different attorneys. Again, the fact or trying to aspire bad motives to Nancy by following the oncologist's directives. I'm not looking at either the motives of Nancy or Diana. I'm looking at the motives of Jackie in that she did not select her live-in companion to make medical decisions. Knowing that under the 2,000 will that existed, he was going to take something. Do you think that fact is relevant? Did the court focus on that fact at all? Judge, I can't say that the trial court specifically noted the fact that the court noted the relationship between Nancy and Jackie. It noted that relationship, and I think that's important, and the inferences from that relationship. You've answered my question. Thank you, Your Honor. Mr. Bush, did Jackie have any relationship with Gene's granddaughters who, if I understand correctly, were the ultimate beneficiaries under that second will? Well, they would have. So Gene's daughter, Diana, had a child, and her child had children. So there were a couple of generations there. Ashley was Diana's daughter. Ashley would have taken had Gene pre-deceased. Yes, there was some testimony as far as Mr. Copeland presented to the court some birthday cards. They went to some family events with them. Again, we have never taken the position that there wasn't a relationship there. There clearly was. But that doesn't mean that all of the facts overwhelmingly support the fact that this will, she was not competent at the time she signed it. She was unduly influenced when signing it, and it was not witnessed properly. And that doesn't diminish those relationships. But Jackie made her decisions and did not change them from the 2000 will that she had in place. And as the trial court noted, she was diagnosed in early 2008, and the confusion, while consistent, did decline. As the trial court noted, she had time had she wished to do it before things got bad. The court noted that. And she did. She could have done it. She was a hard-nosed, no-nonsense worker for public aid. Well, not public aid, DHS now. The testimony was that she wasn't a pushover. But the evidence showed, and the trial court believed, that had she wanted to make a decision prior to when things got bad, she could have. Thank you. Are there any other questions, Your Honors? No. Thank you, Mr. George. Thank you. Mr. Copeland, any rebuttal? No. The issue of the attestation of the will is a frustration for me, since it was not subject of a cross-appeal, and I understand the reason why. But I also am concerned that it seems to be argued and seems to be suggested to the court that somehow this court can take a look and reverse that. And I certainly am frustrated with that, since I did not have an opportunity to really respond in a brief to that, because it wasn't handled the way. So how would you suggest we address that? Leave it alone. All right. That's my attitude. It's not before the court. That's my attitude. It shouldn't be before the court. Hey, how about a new will? I'm sorry, but I don't think that really addresses what occurred. Let's strip away the colorations. Let's look at what language really means here. We know that on the 3rd of November, Gene and Jackie went by car, driven by Gene, to Elwynn Neal's office. That's a different thing than Gene taking Jackie to his lawyer. There's no suggestion anywhere of that. That is speculation. We know Gene and Jackie, who went everywhere together, went to Elwynn Neal's office. Why did they first go to Attorney Pignatelli's office? Because they were driven there by Nancy. But Gene was with them. I understand that. There are a lot of inconsistencies here. And incidentally, we always deal with inconsistencies and contradictions in lawsuits, as Mr. Bush said. But at least you should be consistent with your own case. In this case, what you've got is the contestant absolutely contradicting her own evidence. Flat out. You can't have a, yes, she's competent to execute a POA on the 6th. Oh, no, she wasn't competent to execute a POA on the 6th. You can't do that. You can't take that position. In a jury trial, I would move to impeach and instruct the jury to disregard for heaven's sakes. It's a bench trial. You expect the judge to take care of those inconsistencies and contradictions. You have two lawyers of some considerable experience who spent some time with Jackie Adams. And to the satisfaction of both of those lawyers, Jackie Adams was competent on the 6th day of November to execute a POA. She was presented to Kelly Walker by Nancy Kulas and Michelle Ford for that purpose. Obviously, they believed that she was competent to execute a POA, or they had some other motive that shouldn't be considered. Elwynn Neal spent time with them on the 3rd. Again, page one was a client interview with Shane Gibbons. Jackie's not even mentioned on page one. It's all about Jean. Page two, there's a little notation. Again, almost as an afterthought. Now, if we want to engage in speculation, I can say, well, Jean said, Jackie, I'm going to go to my lawyer Elwynn and get my will done. Come along. Get there, and she listens to what Jean and Elwynn talk about and says, I think I'd like to change my will, too. I can speculate just as good as the next guy. But that's not what's before the court. Thank you. The fiduciary relationship based on love, affection, etc., and you'll find it in the brief, must be shown by clear and convincing evidence before that presumption arises and shifts the burden of proof. If you've got a fiduciary relation based on power of attorney as a matter of law, then that presumption is there automatically, and you've got to overcome it. But if it's based on a personal relationship, you must show that by clear and convincing evidence, and you must show the dominion by that person who is in that fiduciary capacity. And I've got to say that that dominance has got to relate to something relevant to the execution of a document. It's got to overcome the will of the other person. It's got to interfere with their intellectual functioning and capacity. It's got to sway them to do something. It's not just providing for medication or taking care of her food or taking care of her bathing or something like that. That's not what that's for. Is that all he did? Gene was an elderly gentleman who had suffered a stroke and had had bypass surgery. He was affected by the stroke. He had a speech disability. He had a gait disability and was partially paralyzed on his left side, I believe. He was not capable of taking care of her physically. He did a lot of the, you know, just attending to her, providing medication, helping her with that, and maybe some meals. Did she trust him? She lived with him for 17 years, well, the last eight. They lived together. They traveled together. They were companions. I don't think anybody ever said they were anything other than companions and lovers and the closest of friends. Thank you very much. Thank you. Thank you. We thank both of you for your attendance this morning. We'll take the matter under advisement and we'll issue a written decision as quickly as possible. The court will now stand and do recess for a panel change. May I just say what a pleasure it is to have you two both in front of me again. Obviously you're both very prepared, did a great job in this case, and it's a pleasure for me to have the opportunity to see members of the Bar Association from Whiteside County appear here and demonstrate such a high level of expertise. I'm just very proud of the effort both of you made. Thank you.